1

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT

9                        NORTHERN DISTRICT OF CALIFORNIA

10                               SAN JOSE DIVISION

11   R. H., a minor, RICHARD H., GUARDIAN AD )     Case No.: 11-CV-03729-LHK
     LITEM FOR R. H., a minor, and RICHARD H., )
12                                            )
              Plaintiffs,                     )    ORDER GRANTING DEFENDANTS'
13         v.                                 )    MOTION FOR SUMMARY JUDGMENT
                                              )
14   LOS GATOS UNION SCHOOL DISTRICT,         )
     LOS GATOS-SARATOGA RECREATION,           )
15   LISA FRASER, LISA NANEZ, CURTIS          )
     SUMMERS AND DAN RACIMO, AND DOES )
16   1 THROUGH 50, INCLUSIVE,                 )
                                              )
17            Defendants.                     )
                                              )
18

19          Plaintiffs R. H. and his father and guardian, Richard H. (collectively "Plaintiffs"), filed this

20   action against the Los Gatos Union School District, Los Gatos-Saratoga Community Education and

21   Recreation,[1] Lisa Fraser, Lisa Nanez, Curtis Summers, and Dan Racimo (collectively,

22   "Defendants"), alleging violations of R. H.'s Fourteenth Amendment liberty interests, as well as

23   various state law torts. *See* Plaintiffs' Second Amended Complaint ("SAC"), ECF No. 41 ¶ 2.

24   Plaintiffs' claims arise out of an incident which occurred during a school-sponsored wrestling

25   match and which resulted in injuries to Plaintiff R. H. *Id.* ¶ 23–28. Before the Court is Defendants'

26

27   ────────────────────
     [1] Though named as Los Gatos-Saratoga Recreation Department in this suit, the correct title of this
28   entity appears to be Los Gatos-Saratoga Community Education and Recreation. *See* Declaration of
     Steve Rauwolf, ECF No. 67. The parties do not dispute that the entities are one and the same.

Motion for Summary Judgment ("Mot."). *See* ECF No. 61. Plaintiffs have filed an Opposition ("Opp'n"), ECF No. 71, and Defendants have filed a reply ("Reply"), ECF No. 75. Pursuant to Civil Local Rule 7-1(b), the Court finds this matter appropriate for resolution without oral argument and hereby VACATES the hearing on this Motion and the Case Management Conference set for April 3, 2014, at 1:30 p.m. Having considered the record in this case, applicable law, and the parties' briefs, the Court GRANTS Defendants' Motion for Summary Judgment.

## I.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiffs R. H. and Richard H. bring this action against Defendants, alleging that Defendants' negligence led to R. H.'s injury during a middle school wrestling match, and that Defendants' conduct violated R. H. and Richard H.'s constitutional rights under the Fourteenth Amendment. SAC ¶¶ 2, 16–43; Declaration of Richard H. ("Richard H. Decl."), ECF No. 70 ¶ 21. Specifically, Plaintiffs allege that Defendants' negligence and misconduct led to R. H.'s wrestling against a larger, more experienced opponent, which resulted in R. H.'s injury. Richard H. Decl. ¶¶ 4, 6, 21.

### A.   The Parties

Plaintiff R. H. started at Fisher Middle School as an 8th grade student in the fall of 2010. Deposition of R. H. ("R. H. Depo"), ECF No. 65, Ex. A at 9. In October, shortly after the semester began, R. H. joined the school's wrestling team. *Id.* at 32. R. H. was thirteen years old at the time. Declaration of R. H. ("R. H. Decl."), ECF No. 69 ¶ 3. Although he had no prior wrestling experience, R. H. had for several years participated in various martial arts and had achieved an "advanced brown belt" in taekwondo. R. H. Depo at 38–44, 48.

Plaintiffs bring this action against the Los Gatos Union School District, Los Gatos-Saratoga Community Education and Recreation, Lisa Fraser, Lisa Nanez, Curtis Summers, and Dan Racimo. SAC ¶ 2. Fisher Middle School is in the Los Gatos Union School District, and R. H. was a student in the district at the time of his injury. SAC ¶ 10. Defendant Lisa Fraser is the principal of Fisher Middle School. Declaration of Lisa Fraser, ECF No. 66 ¶ 1. Student athletics in the district are run by Los Gatos-Saratoga Community Education and Recreation. Deposition of Lisa Fraser, ECF No. 68, Ex. 8 at 32–33.

1  Defendant Lisa Nanez is employed by the Los Gatos Union School District, and is the

2  athletic director at Fisher Middle School, where she also works as a physical education teacher.

3  Declaration of Lisa Nanez, ECF No. 62 ¶ 1. As athletic director, she finds coaches for the various

4  Fisher Middle School athletic teams and recommends them to Los Gatos-Saratoga Community

5  Education and Recreation. *Id*. ¶ 2. Defendants Lisa Nanez and Lisa Fraser recommended

6  Defendants Curtis Summers and Dan Racimo as potential wrestling coaches to Los Gatos-Saratoga

7  Community Education and Recreation. *Id*. ¶ 3

8  Defendants Curtis Summers and Dan Racimo are Fisher Middle School's wrestling coaches

9  and are employed by Los Gatos-Saratoga Community Education and Recreation. SAC ¶ 15.

10  Defendant Summers, a former middle and high school wrestler, obtained his "copper" USA

11  wrestling coach certification in 2000, which qualifies him as a wrestling coach up to the high

12  school level. Declaration of Curtis Summers ("Summers Decl."), ECF No. 64 ¶ 3. Defendant

13  Racimo also wrestled in high school, and likewise received his "copper" certification in 2008.

14  Declaration of Dan Racimo ("Racimo Decl."), ECF No. 63 ¶ 3. Although employed by Los Gatos-

15  Saratoga Community Education and Recreation, both Summers and Racimo declined the stipend

16  offered to athletics coaches, preferring instead to volunteer their services as coaches. Summers

17  Decl. ¶ 4; Racimo Decl. ¶ 4.

18  **B.    The Release**

19  Upon joining the team, Richard H. filled out and signed the required "After School Sports

20  Emergency/Health Insurance form" and release, which stated in pertinent part that Richard H.:

21  agrees to indemnify and hold the Los Gatos Union School District and Community
Education and Recreation Department harmless and release the district and Department
22  from any and all liability for any injury which may be suffered by [R. H.], arising out of or
in any way connected with participation in [the wrestling team].
23

24  ECF No. 64, Ex. A.

25  The release further stated that:

26  I HAVE READ THE AFTER SCHOOL SPORTS INFORMATION AND SCHOOL
PARTICIPATION CONTRACT AND WILL ABIDE BY ALL RULES AND POLICIES
27  AND FULLY UNDERSTAND THAT I ASSUME ALL RISKS FOR ANY INJURIES
RECEIVED AND AGREE TO ACCEPT FINANCIAL RESPONSIBILITY.
28

Case No.: 11-CV-03729-LHK
ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1   *Id.* The release language appears to be in 10 point font, the same font size as the rest of the

2   emergency contact and health insurance form that Richard H. completed and signed, and is situated

3   just above the signature and date line. *See id.* R. H. testified that he signed a waiver as well,[2] but

4   that he "didn't really read through either of them." R. H. Depo at 50. Nevertheless, R. H.'s general

5   understanding was that the release form "releas[ed] the school district and the coaches from any

6   and all injuries that [he] might sustain while participating on the Fisher wrestling team." *Id.* at 50–

7   51.

8       **C.      The Fisher Wrestling Team**

9       R. H. joined the Fisher wrestling team in October of 2010. After the first practice of the

10   season, Fisher's wrestling coaches, Defendants Curtis Summers and Dan Racimo, selected R. H. to

11   join the varsity team. R. H. Depo at 66, 68; ECF No. 64 ("Summers Decl.") ¶ 6; ECF No. 63

12   ("Racimo Decl.") ¶ 6. Varsity athletes wrestle in different weight classifications according to their

13   body weight. The team's "Wrestling Rules" state that the weight classifications include 70, 75, 80,

14   85, 90, 95, 100, 105, 110, 115, 120, 125, 135, 145, 155, 165, 175, and 205 pounds, and a further

15   heavyweight for wrestlers beyond 205 pounds. *See* ECF No. 72, Ex. 6 ("2010 Fisher Wrestling

16   Rules").[3] R. H.'s first weigh-in took place during the first varsity practice, sometime in October of

17   2010. R. H. Depo at 73–74; *see also* ECF No. 73, Ex. 35 (list of Fisher wrestlers and corresponding

18   weights). According to R. H., he weighed 155.3 pounds at this initial weigh-in, wearing a t-shirt,

19   shorts, and possibly wrestling shoes. R. H. Depo at 73–74.[4]

20       Under the league wrestling rules, a wrestler may "wrestle up" and compete in the next

21   weight class above his or her lowest weight classification. *See* 2010 Fisher Wrestling Rules;

22   _____

23   [2] As R. H.'s signature does not appear on the waiver and release form, it is not clear to what R. H.
     is referring. Whether R. H. signed a separate release is not important because as discussed below,

24   the release signed by his father is binding on R. H. as well. *See Aaris v. Las Virgenes Unified Sch.
     Dist.*, 64 Cal. App. 4th 1112, 1120 (1998).

25   [3] The "Wrestling Rules" used by the Fisher Middle School wrestling team appear to be adopted
     from the 2010 revision of the "West Valley Athletic League Wrestling Procedures and Rules." *See*

26   ECF No. 72, Ex. 6.
     [4] R. H.'s weight was recorded as 155.0 on a list of Fisher wrestlers and their initial weights created

27   by Defendant Racimo after the first practice. ECF No. 74, Ex. 7 ("Racimo Depo") at 60; ECF No.
     73, Ex. 35. For purposes of Defendants' motion for summary judgment, the Court accepts as true

28   R. H.'s assertion that his weight was 155.3 pounds.

4

1    Racimo Decl. ¶ 7; Summers Decl. ¶ 9. The rules also provide for a two pound allowance, so a 157

2    pound wrestler may still wrestle in the 155 pound class, which would otherwise include only 145–

3    155 pound wrestlers. *See* 2010 Fisher Wrestling Rules; ECF No. 74, Ex. 6 ("Summers Depo"), at

4    64; Racimo Depo at 43–44. At 155.3 pounds, R. H. was initially eligible to compete in: (1) the

5    155–165 pound weight class; (2) the 145–155 class on account of the 2-pound allowance rule; and

6    (3) he could even have wrestled up to the 165–175 class.

7        From early October until the league championships on December 3, 2010, the team held

8    wrestling practice every weekday, and wrestled in tournaments on Saturdays. R. H. Depo at 60.

9    Over the course of the season, R. H. competed in both the 155 and 165 pound classes. *Id*. at 113.

10   During the weekday practice sessions, R. H. would often practice and spar with two wrestlers, C.

11   H. and M. M. *Id*. at 77–78, 87. Both were more skilled, both were in better shape, and at around

12   186 pounds, C. H. was significantly larger and heavier than R. H. *Id*. at 77–78, 82, 87. Defendant

13   coaches Summers and Racimo also coached R. H. at each practice, helping him improve his

14   wrestling and his physical conditioning. *Id*. at 84–85. R. H. lost all but one match during the

15   season, which apparently is common for new wrestlers and had been expected by both R. H. and

16   his father. R. H. Depo at 63, 107, 114; ECF No. 68, Ex. 4 ("Richard H. Depo") at 46. Some of the

17   matches R. H. lost as a result of being pinned. Some were prolonged, and he lost by points. R. H.

18   Depo at 106–107; Richard H. Depo at 79. R. H. was not injured in any of his matches during the

19   regular season, whether he was wrestling in the 155 or 165 pound class, nor was he ever concerned

20   about being hurt competing in either class. R. H. Depo at 144, 189. He continued to have no

21   concerns about the prospect of injury throughout the season, and his only concern about

22   participating in the 165 pound weight class at the year-end league tournament was that he felt he

23   had no chance of winning. *Id*. at 189.

24       R. H. contends that he lost weight over the course of the season on account of his daily

25   participation in strenuous wrestling practices. R. H. Decl. ¶ 5; R. H. Depo 97–98. R. H. alleges that

26   the coaches did not weigh him regularly during the season, R. H. Decl. ¶ 5–6, and did not weigh

27   him prior to dual meets as required by the league rule. *Id*. ¶ 5; *see also* Summers Depo at 60

28   (stating that wrestlers were not weighed in before each dual meet during the 2010 season).

5

United States District Court
For the Northern District of California

1  Defendant coaches Racimo and Summers state in their depositions that the wrestlers weighed in

2  daily at practice and self-reported their weights to the coaches. Racimo Depo at 60–61; Summers

3  Depo at 66–67. If the wrestlers self-reported significant weight changes, the coaches would make

4  note of the new values on their list of wrestlers and corresponding weights. Racimo Depo at 60–61.

5  Plaintiffs maintain that Defendants themselves did not weigh in the wrestlers during practices, but

6  Plaintiffs do not appear to dispute that the wrestlers weighed themselves on a daily basis. R. H.

7  Decl. ¶ 5 ("The *coaches* never measured my weight during practices.") (emphasis added).

8       Beyond R. H.'s initial weigh-in at 155.3 pounds, he was also weighed in at the Hyde

9  Classic wrestling meet on November 20, 2010. R. H. Decl. ¶ 6. At that point, two weeks before the

10 league championships, R. H.'s weight is recorded in Defendant Summers' records as being 151.6

11 pounds. *Id.*; ECF No. 73, Ex. 41, 42 (handwritten charts indicating a weight of 151.6 for R. H.).

12 According to Defendants, R. H. was weighed-in on November 20, 2010 wearing only a wrestling

13 singlet, not his street clothes. Summers Decl. ¶ 8. R. H. states in his declaration that he did not

14 weigh 151.6 pounds at that point.[5] R. H. Decl. ¶ 6.

15      At some point during the course of the regular season, another wrestler on the Fisher team,

16 L. B., weighed in at the very top of his weight class shortly before a dual meet. Summers Depo at

17 137–38. As they were about to depart for the meet, Coach Summers asked L. B. if he wanted to

18 "wait an hour" to eat breakfast, so that L. B. could weigh in at the meet before increasing his

19 weight by eating breakfast. *Id.* L. B. elected to eat "a bowl of cereal" anyway, and after weighing

20 in over the maximum, he did not wrestle at that meet. *Id.* at 138. Plaintiffs contend that L. B. was

21 subsequently ridiculed by the coaches and the other students for eating the cereal, R. H. Decl. ¶ 20,

22 which Defendants deny. Summers Depo at 138, 142; Racimo Decl. ¶ 7.

23      **D.       Final Weigh-In for the Season-End League Championships**

24      The league championships were held at Wilcox High School in Santa Clara, California on

25 December 3, 2010. Richard H. Depo at 76. All of the wrestlers who were to compete in the league

26 championships were weighed in the day before, as required by the league rules. *See* 2010 Fisher

27

28 _____
[5] R. H.'s declaration does not state what he believes his weight to have been on November 20, 2010. See R. H. Decl. ¶ 6.

Case No.: 11-CV-03729-LHK
ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Wrestling Rules. Following the weigh-in, the coaches for the teams participating in the tournament held a seeding meeting. ECF No. 68, Ex. 10 ("Petulla Depo") at 23–24. These seeding meetings differed depending on whether the coaches were seeding the wrestlers for a regular-season dual meet or for tournaments like the league championships. *Id.* At dual meets, any wrestler from any team may participate, so the coaches would seed the wrestlers to ensure that participants were matched with others of somewhat similar skill. *Id.* at 25–26. Because tournaments like the league championships were not part of the mandatory wrestling team schedule, participation was voluntary and wrestlers had to earn their place and "opt in." *Id.* Wrestlers in these tournaments were also typically at a higher skill level. *Id.* Thus, the seeding meeting for the league championship involved seeding wrestlers according to their records, so that the coaches could set up a proper bracket. *Id.* A tournament bracket initially pits the top seeded wrestlers against the lower seeded wrestlers, so that the top two wrestlers will ultimately face off in the final match, should they both win all the matches up to that point. *Id.*

Fisher wrestlers were weighed in at Rolling Hills Middle School, and were weighed by Coach Summers and Stephen Petulla, the Rolling Hills coach. R. H. Depo at 163; Summers Depo at 101–102. Stephen Petulla described the weigh-in procedure thus:

> "The schools would line up. They'd most often be in order of weight, and we would call, hey, you know, what's your name? The gentleman would tell me his name. What weight are you wrestling? He'd say 70 pounds. He'd step on the scale, and we'd check his weight, and if he weighed, you know, if he made weight, they'd write him down and check him off, and he'd go on the list to wrestle."

Petulla Depo at 21–22. Wrestlers were weighed with their clothes on, and R. H. was weighed in as Fisher's wrestler in the 165 pound weight class. R. H. Depo at 163, 176–177. The third party coach, Stephen Petulla, reported R. H.'s weight, and Defendant Summers recorded this weight on his listing of wrestlers as 152.6. Summers Decl. ¶¶ 14, 15; *see also* ECF No. 73, Ex. 8 (handwritten list of Fisher wrestlers and weights measured on December 2, 2010 for the league championships on December 3, 2010). At 152.6, R. H. was therefore recorded as weighing one pound more than he had at the November 20, 2010 weigh-in. R. H. Decl. ¶ 6, ECF No. 73, Ex. 41, 42.

R. H. disputes this weight, and testified that when he stepped on the scale on December 2,

1   2010, the scale read 148.5, not 152.6. R. H. Depo at 98, 169–171. However, Stephen Petulla,

2   present at the weigh-in as a neutral third party, made no objection when R. H. was weighed and his

3   weight was recorded at 152.6. *Id*. at 169. R. H. testified that at some point after Coach Summers

4   had recorded R. H.'s weight at 152.6, Petulla, who knew R. H. would be wrestling in the 165

5   pound class, "did make a mention then that he didn't know how much a wrestler was allowed to

6   wrestle up, but that seemed a little—a little much." R. H. Depo at 170. This allegation is not in the

7   FAC or SAC, and the first time it appears is in R. H.'s deposition on August 8, 2013. *Id*. The

8   record indicates that Plaintiffs' counsel did not ask Summers or Racimo about any such remark at

9   their depositions, which occurred several months before R. H. first made this allegation during R.

10  H.'s depositon. *See* Racimo Depo at 1; Summers Depo at 1. Stephen Petulla, who was deposed

11  after R. H., did not recall such a conversation or remark. Petulla Depo at 31–33. R. H. further

12  testified that he had not otherwise ever seen, nor was he aware of, any situation in which an

13  incorrect weight was recorded by a coach for a Fisher wrestler. *Id*. at 170–171. R. H. admits he

14  made no mention of the alleged weight manipulation by Coach Summers to anyone until after he

15  was injured. *Id*. at 182. Nor did he remark to anyone before the incident that he was surprised to be

16  wrestling in the 165 pound weight class. *Id*.

17      Plaintiffs state that when R. H. weighed in on December 2, 2010, he was wearing clothing

18  and had items in his pockets that weighed four pounds in total. Richard H. Decl. ¶ 11; R. H. Decl. ¶

19  9. Although Plaintiffs appear to no longer possess the actual clothing R. H. was wearing and the

20  items he had in his pockets on December 2, 2010, Plaintiffs later measured the weight of similar,

21  representative items to arrive at their estimate of "4.0 lbs." *Id*. Defendants object that Plaintiffs'

22  "recreation" does not accurately reflect what R. H. was wearing on December 2, 2010. *See* ECF

23  No. 78 at 1. The record is thus unclear as to what exactly R. H. was wearing at the time, and what

24  he had in his pockets.

25      Additionally, Plaintiffs' allegations regarding the content of R. H.'s pockets and what he

26  was wearing have changed several times over the course of this litigation. Initially, Plaintiffs

27  alleged in the SAC that the coaches instructed R. H. to put as much as he could in his pockets to

28  increase his weight, and that he weighed in wearing his jacket and shoes. SAC ¶ 22 (alleging that

8

1    Defendants "instructed [R. H.] to weigh-in wearing his street clothes, shoes, jacket, and 'whatever

2    else might fit easily into [his] pockets.'"). Defendants deny this accusation. Summers Depo at 101–

3    102; Racimo Depo at 100–101. Later, R. H. testified that Defendants did not instruct him to put

4    anything in his pockets, but that Defendant Racimo or Summers told him not to *remove* anything

5    from his pockets. R. H. Depo at 166–167. R. H. also testified that no one had ever told him at any

6    point during the season to put anything into his pockets before being weighed in. R. H. Depo at

7    166–167. Additionally, R. H. testified that he had in fact removed his shoes and jacket before being

8    weighed in, but that he may have had some loose change and possibly his headphones in his

9    pockets as well. *Id.* at 165–168, 174.

10          In their opposition, Plaintiffs drop their contention about headphones, and assert instead

11   that it was actually an iPod that R. H. had in his pockets when he weighed in on December 2, 2010.

12   Opp'n at 2, 11. The Opposition provides no citation in support of Plaintiffs' assertions about an

13   iPod. *See* Opp'n at 2, 11. The only other mention of an iPod is in R. H.'s declaration, *see* R. H.

14   Decl. ¶ 9, which contradicts R. H.'s deposition testimony that his pockets contained "[his] cell

15   phone and [his] wallet" and that "there might have been some loose change and [his] headphones,

16   as well." R. H. Depo at 166.

17        **E.      R. H. Is Injured While Wrestling at the League Championships**

18          During the league championship the following day, December 3, 2010, R. H. competed in

19   the 165 pound weight class. Summers Decl. ¶ 13; SAC ¶ 26. R. H. testified that his only concern

20   about competing in the 165 weight class was that he felt he would very likely lose his matches, and

21   that he was unconcerned about somehow being injured as a result of competing in that weight

22   class. R. H. Depo at 186.

23          R. H. was matched up against an opponent who Plaintiffs allege weighed 164 pounds. SAC

24   ¶ 26 (opponent weighed 164 pounds); *see also* Opp'n at 9 (opponent weighed nearly 165 pounds).

25   Plaintiffs point to nothing in the record showing R. H.'s opponent's weight, and state no basis for

26   their knowledge. Upon seeing his opponent, R. H. remained unconcerned about potential injury. R.

27   H. Depo at 186. Although R. H. had no concerns about his physical safety, he testified that he was

28   nevertheless "terrified by his [opponent's] size." R. H. Decl. ¶ 12. During the match, R. H.'s

United States District Court
For the Northern District of California

9

1    opponent took him to ground, and as a result R. H. suffered a fractured jaw. Richard H. Decl. ¶¶ 6,

2    9; *Id*. Ex. 1, 2 (medical records of R. H.'s post injury operation and treatment).

3              After the incident, Richard H. brought R. H. to the Emergency Room at Santa Clara

4    Medical Center in San Jose, California, where Richard H. works as a Certified Registered Nurse

5    Anesthetist. *Id*. ¶ 10. The SAC states that R. H. was taken to the hospital the day after the incident,

6    December 4, 2010. ECF No. 41 ¶ 23. Plaintiffs now contend that R. H. was taken to the hospital

7    immediately following the incident on December 3, 2010. *See* Richard H. Depo at 106–108.

8              While at the Medical Center, Richard H. claims in his declaration that he observed R. H.

9    being weighed wearing only a hospital singlet, and asserts that the scale measured R. H.'s weight at

10   139 pounds. Richard H. Decl. ¶ 11. In the SAC Plaintiffs allege that R. H.'s weight in the

11   emergency room was 138 pounds. ECF No. 41 ¶ 23 ("After his injury, at the hospital the next day,

12   R. weight was recorded at only 143 lbs with his clothes and jacket on. He weighed 138 with just

13   underwear."). Richard H. asserts that he is certain of the 139 pounds weight because he saw the

14   number on the scale, and he spoke with the attending medical personnel about the appropriate

15   amount of pain medication R. H. should receive, a determination which depends in part on a

16   patient's weight. *Id*.

17             On December 6, 2010, Richard H. took R. H. to the Stanford Hospital and Clinics for a pre-

18   operative visit, and R. H. was weighed by a nurse at 143 pounds. *Id*. ¶ 12; *see also id*., Ex. 1

19   (medical record from December 6, 2010 visit). The following day R. H. was again weighed at

20   Stanford, and his weight was recorded as 144 pounds, 10 ounces. *Id*. Ex. 2 (medical record from

21   December 7, 2010 visit). According to Plaintiffs, in both cases R. H. was fully clothed, and on

22   December 7 R. H. was wearing a jacket. Richard H. Decl. ¶¶ 11, 13, 14; Opp'n at 2–3.

23        **F.    Procedural History**

24             Prior to bringing this suit, Plaintiffs exhausted their administrative remedies and complied

25   with the California Government Tort Claim Act, Government Code § 900 *et. seq*. by filing a claim

26   with the Los Gatos Union School District on May 19, 2011. SAC ¶ 9. This claim was rejected on

27   June 16, 2011. *Id*. Plaintiffs also filed a claim with Los Gatos-Saratoga Community Education and

28   Recreation on May 13, 2011, which was rejected on June 24, 2011. *Id*.

10

1          Plaintiffs filed a Complaint against Defendants in federal court on July 29, 2011. ECF No.

2     1. On September 15, 2011, Plaintiffs filed a First Amended Complaint ("FAC"). ECF No. 4. The

3     FAC asserted eleven claims against Defendants: (1) a claim under 42 U.S.C. § 1983 against

4     Defendants Fraser, Nanez, Summers and Racimo for violating R. H.'s constitutional liberty interest

5     under the Fourteenth Amendment; (2) a state law claim for negligence against all Defendants; (3) a

6     state law claim for failure to train/hire/supervise against the School District, Los Gatos-Saratoga

7     Recreation, Fraser, and Nanez; (4) a claim under 42 U.S.C. § 1983 against Fraser and Nanez for

8     failure to train/hire/supervise; (5) a state law claim for intentional misrepresentation against

9     Summers and Racimo; (6) a state law claim for concealment against Summers and Racimo; (7) a

10    state law claim for negligent misrepresentation against Summers and Racimo; (8) a claim for

11    dangerous condition of public property against the School District and Los Gatos-Saratoga

12    Recreation; (9) a state law claim of negligence per se against all Defendants; (10) a state law claim

13    of negligent infliction of emotional distress against all Defendants; and (11) a state law claim of

14    intentional infliction of emotional distress against Summers and Racimo. *See* ECF No. 4.

15         Defendants moved to dismiss on November 14, 2011, ECF No. 13, and Senior Judge

16    William T. Hodges granted in part and denied in part Defendants' motion on September 4, 2012,

17    ECF No. 29. Judge Hodges dismissed with prejudice Plaintiffs' Section 1983 claims to the extent

18    they were raised against Defendants in their official capacities, but permitted the claims insofar as

19    they were raised against Defendants in their individual capacities. *Id*. at 15. Also dismissed with

20    prejudice was Plaintiffs' claim for dangerous condition of public property against the Los Gatos

21    Union School District, but Judge Hodges granted Plaintiffs leave to amend to assert this claim

22    against Los Gatos-Saratoga Recreation.[6] *Id*. Plaintiffs' intentional misrepresentation, concealment,

23    and negligent misrepresentation claims were dismissed without prejudice because: (1) although

24    Plaintiffs identified a statutory basis for these claims in their opposition to Defendants' motion to

25    dismiss, Plaintiffs failed to so plead in the FAC; and (2) the Court found that Plaintiffs had not

26    alleged a basis for finding a school employee could be held liable for an intentional tort under the

27

28
_____

[6] Plaintiffs appear to have dropped this claim in the SAC. *See* ECF No. 41.

Case No.: 11-CV-03729-LHK
ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

statutes relied upon by Plaintiffs.[7] *Id*. at 11–12. Without stating whether dismissal was with or without prejudice, Judge Hodges dismissed Plaintiffs' claim for negligence per se, finding that under California law negligence per se is an evidentiary presumption of negligence and not a separate cause of action, and that it did not apply in this case. *Id*. at 13. Finally, Judge Hodges dismissed with prejudice Plaintiffs' claim for negligent infliction of emotional distress as it pertained to Plaintiff R. H. because the Court found the claim duplicative of and subsumed by Plaintiffs' other claims of negligence. *Id*. at 14. The Court permitted Plaintiffs to go forward with their negligent infliction of emotional distress claim as it pertained to Plaintiff Richard H. *Id*. Judge Hodges denied Defendants' motion to dismiss as to all other claims. *Id*. at 16.

Following Judge Hodges' order on Defendants' motion to dismiss, the case was reassigned to the undersigned judge. On September 28, 2012, Plaintiffs filed the SAC, ECF No. 41, and on November 7, 2012, Defendants filed an answer, ECF No. 42. In the SAC, Plaintiffs assert the following nine claims against the Defendants: (1) a claim under 42 U.S.C. § 1983 against Defendants Fraser, Nanez, Summers, and Racimo for violating R. H.'s constitutional liberty interest under the Fourteenth Amendment (Count I); (2) a state law claim for negligence against all Defendants (Count II); (3) a state law claim for failure to train/hire/supervise against the School District, Recreation Department, Fraser, and Nanez (Count III); (4) a claim under 42 U.S.C. § 1983 against Fraser and Nanez for failure to train/hire/supervise (Count IV); (5) state law claims for intentional misrepresentation, concealment, and negligent misrepresentation against Summers and Racimo (Counts V-VII); (6) a state law claim of negligent infliction of emotional distress against all Defendants (Count VIII); and (7) a state law claim of intentional infliction of emotional distress against Summers and Racimo (Count IX). *See* ECF No. 41.

Defendants moved for summary judgment on January 14, 2014. *See* ECF No. 61. Plaintiffs filed an opposition on February 5, 2014, *see* ECF No. 71, and on February 18, 2014, Defendants filed a reply, *see* ECF No. 75. Defendants accompanied their reply with two separate sets of

---

[7] The Court found that all of the authority concerning the statutes cited by Plaintiffs (Cal. Gov't Code § 815.6 and Cal. Educ. Code § 44807) addressed claims for negligence and/or negligent supervision, not intentional torts. *Id*. at 11–12.

12

1    objections: (1) to evidence filed in support of Plaintiffs' opposition, ECF No. 76; and (2) to the

2    expert witness report of Rod Hedlund in support of Plaintiffs' opposition, ECF No. 77. Because

3    these objections were filed separately and contrary to the procedure set forth in Civil Local Rule 7-

4    3(c), the Court disregards them.[8]

5    **II.    LEGAL STANDARD**

6          Summary judgment is appropriate if, viewing the evidence and drawing all reasonable

7    inferences in the light most favorable to the nonmoving party, there are no genuine disputed issues

8    of material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a);

9    *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is "material" if it "might affect the

10   outcome of the suit under the governing law," and a dispute as to a material fact is "genuine" if

11   there is sufficient evidence for a reasonable trier of fact to decide in favor of the nonmoving party.

12   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "If the evidence is merely colorable, or

13   is not significantly probative," the court may grant summary judgment. *Id*. at 249–50 (citation

14   omitted). At the summary judgment stage, the Court "does not assess credibility or weigh the

15   evidence, but simply determines whether there is a genuine factual issue for trial." *House v. Bell*,

16   547 U.S. 518, 559–60 (2006).

17         The moving party has the burden of demonstrating the absence of a genuine issue of fact for

18   trial. *Celotex*, 477 U.S. at 323. To meet its burden, "the moving party must either produce evidence

19   negating an essential element of the nonmoving party's claim or defense or show that the

20   nonmoving party does not have enough evidence of an essential element to carry its ultimate

21   burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d

22   1099, 1102 (9th Cir. 2000) (citation omitted). Once the moving party has satisfied its initial burden

23   of production, the burden shifts to the nonmoving party to show that there is a genuine issue of

24   material fact. *Id*. at 1103.

25   **III.    DISCUSSION**

26   _____

27   [8] Rule 7-3(c) provides that a party must include evidentiary objections in its reply brief.
     Additionally, the Defendants' reply brief is already at the maximum page limit per Civil L.R. 7-
28   4(b). To permit these separately-filed objections here would allow Defendants to make an end run
     around the page limits set forth in the local rules.

13

United States District Court
For the Northern District of California

1    Plaintiffs bring two federal claims for violation of 42 U.S.C. § 1983, and seven state law

2    claims. Defendants move for summary judgment as to all of Plaintiffs' claims, arguing that there is

3    no basis to find that Defendants violated any of R. H.'s legal rights, and no evidence to support any

4    of Richard H.'s claims against the Defendants. Mot. at 3. Plaintiffs respond that there are triable

5    issues of fact as to all claims, and that Defendants motion should be denied. Opp'n at 20, 22, 25.

6    The Court finds that Plaintiffs' Section 1983 claims fail as a matter of law because

7    Plaintiffs cannot establish that the state-created danger exception applies in this case to avoid the

8    general rule that a state need not protect individuals from third parties. Furthermore, because the

9    Court finds that Plaintiffs expressly waived liability and assumed the risks inherent in wrestling,

10   Plaintiffs' state law claims based on allegations of negligence are barred. Finally, because Plaintiffs

11   fail to identify any genuine dispute of material fact regarding their state law claim for intentional

12   infliction of emotional distress, the Court finds that this claim fails as a matter of law.

13   The Court addresses Plaintiffs' federal Section 1983 claims first. The Court then considers

14   Plaintiffs' state law negligence claims together, and in the final section analyzes Plaintiffs' claim of

15   intentional infliction of emotional distress.

16   **A.    42 U.S.C. § 1983 Claims (Counts I and IV)**

17   Plaintiffs bring two Section 1983 claims for violation of Plaintiffs' substantive due process

18   rights. First, Plaintiffs allege in Count I that Defendants Fraser, Nanez, Summers, and Racimo, in

19   their individual capacities, violated Plaintiff Richard H.'s "constitutionally protected right to raise

20   his son free from unreasonable state interference." SAC ¶ 44.[9] Plaintiffs allege violation of

21   Plaintiffs' constitutional liberty interest under the Fourteenth Amendment, which the Court reads in

22   conjunction with Plaintiffs' assorted allegations of "unsafe practices" to constitute a claim that the

23   Defendants violated Plaintiffs' Fourteenth Amendment right to substantive due process. *See*

24   *Campbell v. State of Washington Dept. of Social and Health Servs.*, 671 F.3d 837, 841–842 (9th

25

26   [9] Plaintiffs also allege in support of their Section 1983 claim that Defendants violated California
     laws and a "liberty interest" guaranteed by the California Constitution. *See* SAC ¶¶ 44, 47, 48.

27   Because Section 1983 prohibits "conduct [that] deprive[s a] plaintiff of a federal constitutional or
     statutory right," these California constitutional and statutory rights do not support Plaintiffs' claim

28   under Section 1983. *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 971 (9th Cir. 2011).

14

Cir. 2011) (similar invocation of vague Fourteenth Amendment claim in conjunction with assertion that the defendants were responsible for "fostering an environment of 'safe care'" comprised a substantive due process claim).

Second, Count IV mirrors the allegations in Count I but is brought against Defendants Fraser and Nanez for supervisory liability. A plaintiff may state a claim under Section 1983 against a supervisor for deliberate indifference. *Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011). "A defendant may be held liable as a supervisor under § 1983 if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Id.* at 1207 (internal quotation marks and citation omitted). "A supervisor can be liable in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others." *Id.* at 1208 (quoting *Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir. 1998)). Because supervisory liability is derivative of the underlying Section 1983 claim, whether Plaintiff can prove deliberate indifference on the part of the Defendant coaches will determine the resolution of this claim as well. Accordingly, the Court discusses them together.

"To succeed on a section 1983 claim, a plaintiff must show that (1) the conduct complained of was committed by a person acting under color of state law; and (2) the conduct deprived the plaintiff of a federal constitutional or statutory right." *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 971 (9th Cir. 2011); 42 U.S.C. § 1983 (2006) (Section 1983 imposes civil liability on any person who, under color of state law, "subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."). The parties here appear not to dispute that the Defendant coaches and school officials were acting under color of state law. *See* Mot. at 9 (reciting the requirements for a Section 1983 claim without disputing the color of law prong). They thus dispute only whether Defendants violated Plaintiffs' Fourteenth Amendment due process rights by falsifying Plaintiff R. H.'s weight so he would compete in a higher weight class, failing to properly

15

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1   train him to compete in that class, breaking league rules which protect the safety of wrestlers, and

2   "orchestrating" a mismatch between R. H. and a heavier, more skilled wrestler at the league

3   championships, all of which Plaintiffs allege resulted in R. H. suffering a broken jaw when he was

4   thrown to the ground during the match. *See* Opp'n at 8–14. Because Plaintiffs bear the burden of

5   proof at trial on their Section 1983 claims, Defendants, as the moving party, bear the initial burden

6   on summary judgment of pointing out "an absence of evidence to support [Plaintiffs'] case."

7   *Celotex Corp.*, 477 U.S. at 325. Before reaching the merits of Plaintiffs' case, the Court reviews the

8   relevant law.

9       "[T]he Fourteenth Amendment's Due Process Clause generally does not confer any

10  affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty,

11  or property interests." *Patel*, 648 F.3d at 971 (citing *DeShaney v. Winnebago Cnty. Dep't of Soc.*

12  *Servs.*, 489 U.S. 189, 196 (1989)); *Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082, 1086

13  (9th Cir. 2000) ("[T]he general rule is that [a] state is not liable for its omissions."). "As a

14  corollary, the Fourteenth Amendment typically 'does not impose a duty on [the state] to protect

15  individuals from third parties.'" *Patel*, 648 F.3d at 971 (quoting *Morgan v. Gonzales*, 495 F.3d

16  1084, 1093 (9th Cir. 2007)).

17      The general rule that a state need not protect individuals from third parties is subject to two

18  exceptions: (1) the special-relationship exception; and (2) the state-created danger exception. *Id.*;

19  *DeShaney*, 489 U.S. at 198–202 (special-relationship exception); *L.W. v. Grubbs*, 92 F.3d 894, 900

20  (9th Cir. 1996) (state-created danger exception).

21      As Plaintiffs here allege that the state failed to protect R. H. from harm at the hand of a

22  third party, to proceed on their Section 1983 claims Plaintiffs must establish either of the

23  exceptions to the general rule that the state is not subject to liability for such injuries. Because

24  Plaintiffs do not contend the special-relationship exception applies, the Court's analysis is limited

25  to the state-created danger exception.

26          **1.      State-Created Danger Exception**

27      The state-created danger exception imposes liability under Section 1983 for failure to

28  protect an individual from harm by third parties "where the state action 'affirmatively place[s] the

16

**United States District Court**
For the Northern District of California

1  plaintiff in a position of danger,' that is, where the state action creates or exposes an individual to a

2  danger which he or she would not have otherwise faced." *Kennedy v. City of Ridgefield*, 439 F.3d

3  1055, 1061 (9th Cir. 2006) (quoting *DeShaney*, 489 U.S. at 197). To benefit from the state-created

4  danger exception, Plaintiffs must show: (1) "affirmative conduct on the part of the state in placing

5  the plaintiff in danger" and (2) "deliberate indifference" by the state to a "known or obvious

6  danger." *Patel*, 648 F.3d at 974 (internal quotation marks and citation omitted). Both requirements

7  must be satisfied for the exception to apply. *Id.*

8          Here, the Court need not reach the first requirement because Plaintiffs fail on the second.

9  As explained below, even viewing the facts in the light most favorable to Plaintiffs, the record does

10  not support their contention that Defendants acted with deliberate indifference to any known or

11  obvious dangers.

12                  **2.      Deliberate Indifference to Known or Obvious Dangers**

13          Deliberate indifference is "a stringent standard of fault, requiring proof that a municipal

14  actor disregarded a known or obvious consequence of his action." *Bryan Cnty. v. Brown*, 520 U.S.

15  397, 410 (1997). The Ninth Circuit defined the contours of deliberate indifference in *Grubbs*, 92

16  F.3d at 898–900. Under *Grubbs*, the standard applied in determining "deliberate indifference is

17  even higher than gross negligence—deliberate indifference requires a culpable mental state." *Patel*,

18  648 F.3d at 974 (citing *Grubbs*, 92 F.3d at 898–900). The state actor must "recognize[ ] [an]

19  unreasonable risk and actually intend[ ] to expose the plaintiff to such risks without regard to the

20  consequences to the plaintiff." *Grubbs*, 92 F.3d at 899 (internal quotation marks omitted). In other

21  words, the defendant "knows that something *is* going to happen but ignores the risk and exposes

22  [the plaintiff] to it." *Id.* at 900. "The deliberate indifference inquiry should go to the jury if any

23  rational factfinder could find this requisite mental state." *Patel*, 648 F.3d at 974 (citing *Wood v.*

24  *Ostrander*, 879 F.2d 583, 588 & n. 4 (1989)).

25          Accordingly, to bring a Section 1983 claim based on a theory of deliberate indifference,

26  Plaintiffs must show that Defendants "recognized [an] unreasonable risk and actually intended to

27  expose the plaintiff to such risks without regard to the consequences to the plaintiff." *Grubbs*, 92

28  F.3d at 899. Since *Grubbs* established this demanding deliberate indifference standard, the Ninth

17

1    Circuit has permitted "few" Section 1983 cases based on deliberate indifference theories to proceed

2    to trial. *See Patel*, 648 F.3d, at 974–75.

3             While the contours of Plaintiffs' deliberate indifference theory in this case are unclear,

4    Plaintiffs' argument appears to be that the following conduct constitutes evidence of Defendants'

5    deliberate indifference to R. H.'s safety: (1) falsifying Plaintiff R. H.'s weight so he would

6    compete in a higher weight class; (2) failing to properly train R. H. to compete in that class; (3)

7    violating league rules designed to ensure safe student participation in the sport of wrestling; and (4)

8    "orchestrating" a mismatch between R. H. and a heavier, more skilled wrestler at the league

9    championships. *See* Opp'n at 8–14.

10            Defendants bear the initial burden on summary judgment of pointing out "an absence of

11   evidence to support [Plaintiffs'] case." *Celotex*, 477 U.S. at 325. In their motion for summary

12   judgment, Defendants argue Plaintiffs have failed to uncover any evidence in support of any of

13   their contentions. The Court agrees. Even viewing the facts in the light most favorable to Plaintiffs,

14   the record simply does not support Plaintiffs' contention that Defendants acted with deliberate

15   indifference to a known or obvious risk by taking actions which led to a "grossly negligent

16   mismatch" and R. H.'s injury. Opp'n at 8–10. Before explaining why this case is factually

17   distinguishable from the cases cited by Plaintiffs and the Ninth Circuit's other decisions regarding

18   deliberate indifference, the Court first examines the various components of Plaintiffs' theory of

19   deliberate indifference and concludes Plaintiff has failed to introduce evidence showing

20   Defendants' deliberate indifference.

21                          *i.      Alleged Weight Falsification*

22            First, Plaintiffs claim that Defendants falsified R. H.'s weight.[10] According to Plaintiffs, R.

23   H. weighed 139 pounds when he wrestled in the league championships, six pounds below the

---

[10] Plaintiffs originally alleged in the SAC that Defendants "falsified weigh-ins by instructing athletes to wear heavy clothes and to put things in their pockets to appear heavier and by instructing athletes to dehydrate themselves in an effort to lose weight." SAC ¶¶ 46, 67. At this point, they contend only that when R. H. weighed in for the league championships on December 2, 2010, Defendant Racimo or Summers told R. H. not to remove anything from his pockets when he weighed in. Opp'n at 2; R.H. Dec ¶¶ 7–9. Defendants deny these allegations. Summers Decl. ¶ 16; Racimo Decl. ¶ 13.

18

Case No.: 11-CV-03729-LHK
ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

minimum weight required to wrestle in the 155 pound class or to wrestle up to the 165 pound class. Opp'n at 11. Plaintiffs contend that the result was a "hopeless[] mismatch" between R. H. and his opponent, and that the weight disparity between R. H. and his opponent caused his injury. *Id.*

There is no direct evidence of what R. H.'s weight was when he wrestled in the league championships on December 3, 2010. All the evidence dates from either before or after the incident, and is contradictory. Construing the evidence of R. H.'s weight in Plaintiffs' favor, as the Court must at summary judgment, the Court finds that Plaintiffs' allegations of weight manipulation fail to raise a material issue of fact regarding Defendants' alleged deliberate indifference.

The parties agree that at his initial weigh-in October, 2010, R. H. weighed 155.0 or 155.3 pounds, clothed. Racimo Depo at 60; R. H. Depo at 73–74. Records of R. H.'s weigh-in on November 20, 2010 show his weight at 151.6 pounds.[11] Plaintiffs contend R. H.'s weight on December 2, 2010 at the tournament weigh-in was 148.5 pounds, fully clothed, while Defendants point to coach Summers' list of wrestlers, which has R. H. at 152.6. R. H. Decl. ¶ 7; Summers Decl. ¶15. Plaintiffs contend that Coach Summers falsified R. H.'s weight by recording his weight as 152.6, even though the scale read 148.5. R. H. Depo at 98, 169–71. Richard H. claims that some twenty-four hours after the tournament weigh-in, he saw a hospital scale measure R. H. at 139 pounds, wearing only a hospital singlet. Finally, medical reports from several days after the incident show R. H. at 143 and 144 pounds 10 ounces—fully clothed, according to Plaintiffs. *See* Richard H. Decl., Ex. 1, 2.

As an initial matter, the Court notes that the purported hospital weigh-in at 139 pounds is not relevant to the inquiry here. Plaintiffs' allegations of weight falsification are one component of their theory that Defendants were deliberately indifferent to R. H.'s safety. However, Defendants' deliberate indifference is a question of Defendants' states of mind *prior* to the incident. Plaintiffs themselves contend that R. H.'s weight was 144.5 (148.5 less four pounds of clothes and miscellanea in R. H.'s pockets) at the official weigh-in for the league championships. Defendants

---

[11] Plaintiffs deny R. H. weighed 151.6 on November 20, but provide no evidence to the contrary and merely state that "[R. H.] did not weigh by then." R. H. Decl. ¶ 6.

Case No.: 11-CV-03729-LHK
ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    would obviously have no knowledge of a post-incident weigh-in at the hospital, and thus that

2    measurement does not bear on the question of whether they exhibited deliberate indifference to R.

3    H.'s safety on the day of the league championships. Accordingly, the relevant question is whether

4    the circumstances of the December 2, 2010 weigh-in support Plaintiffs' allegations of Defendants'

5    deliberate indifference. The Court finds they do not.

6         First, the Court notes that Plaintiffs' allegations regarding R. H.'s weight are inconsistent.

7    Plaintiffs allege that R. H. weighed 148.5 pounds on December 2, 2010, and that four of those

8    pounds were clothing and other items, which means R. H.'s actual bodyweight was 144.5 pounds.

9    This is not consistent with Plaintiffs' claim that R. H. weighed 139 pounds wearing a hospital

10   singlet only 24 hours after. Plaintiffs provide no explanation of how R. H. could have lost nearly

11   six pounds in such a short time.

12        Nonetheless, the Court must construe all factual inferences in the Plaintiffs' favor at the

13   summary judgment stage. If a jury were to accept Plaintiffs' number (148.5) over Defendants'

14   number (152.6), and were to accept Plaintiffs' contention that four of those 148.5 pounds consisted

15   of the weight of R. H.'s clothing and other items, the result would be a weight of 144.5 pounds on

16   December 2, 2010. *See* Opp'n at 1; Richard H. Decl. ¶ 11; R. H. Decl. ¶ 9. Even if R. H.'s weight

17   was in fact 144.5 pounds on December 2, 2010, this does not support Plaintiffs' assertion that

18   Defendants acted with deliberate indifference to R. H.'s safety. Plaintiffs do not dispute that if R.

19   H. weighed 145 pounds he would have been eligible to wrestle in the 165 pound weight class at the

20   league championships, just as he had been during the regular season. In fact, R. H. even

21   acknowledged in his deposition that if his weight was between 145 and 155 pounds on December

22   2, 2010, he would have been eligible to wrestle in the 165 pound weight class. R. H. Depo at 172.

23   Plaintiffs make no attempt to explain how a half pound weight difference would so increase the

24   risks associated with wrestling such that to ignore these risks would constitute deliberate

25   indifference to R. H.'s safety. Plaintiffs assert, without any evidentiary support, that R. H.'s

26   opponent at the league championships weighed 164 pounds. *See* SAC ¶ 26 (opponent weighed 164

27   pounds); Opp'n at 9 (opponent weighed nearly 165 pounds). Assuming Plaintiffs could establish R.

28   H.'s opponent weighed 164 pounds, Plaintiffs provide no evidence, beyond conclusory assertions,

20

1    that wrestling against such an opponent would be unreasonably risky, whether R. H. weighed 144.5

2    pounds or even if he weighed 139. The best Plaintiffs can do is quote the Defendant coaches'

3    statements that the weight classifications are in place to ensure wrestler safety. Opp'n at 10.

4    However, there is nothing to support Plaintiffs' claims that R. H.'s match at the league

5    championships was an "unmistakable mismatch" that posed an unreasonable risk of danger to R. H.

6    Opp'n at 6.

7                              *ii.        **Purported Lack of Training***

8            Plaintiffs argue that R. H. "was clearly not prepared by his coaches to wrestle opponents at

9    the 165 lbs classification because during the entire season he wrestled only one individual in the

10   165 lbs classification." Opp'n at 9. They also contend that Defendants failed "to train, teach, and

11   prepare R. H. to defend himself from such maneuver used by the opponent where the opponent

12   pick-up [sic] R. H. off the mat, and body slammed [sic] R. H. to the ground," and that "R. H. was

13   defenseless because the coaches did not teach him the skills to prevent and defend against such that

14   [sic] maneuver." Opp'n at 16. Plaintiffs have introduced no evidence in support of these

15   allegations. Plaintiffs provide no reason to find that there exists some specific defense needed to

16   counter the particular maneuver used by R. H.'s opponent, or that failure to teach R. H. this defense

17   was negligent, let alone grossly negligent or that it constitutes evidence of deliberate indifference.

18           On the contrary, the evidence shows R. H. received ample instruction and practice over the

19   course of the season. R. H. himself testified that both his coaches provided him wrestling

20   instruction every day during the season of approximately seven weeks, instruction which

21   "absolutely" helped him improve as a wrestler. R. H. Depo at 84. Even if it is true that R. H. only

22   actually wrestled one opponent in the 165 classification during a competitive match, his matches in

23   the 155 class could well have pitted him against opponents who, like R. H., were eligible to wrestle

24   up to the 165 class. Further, according to Plaintiffs' own admissions, R. H. had practiced and

25   sparred all season long against his teammates C. H., who weighed around 186 pounds, and M. M.,

26   who was significantly stronger and more skilled than R. H., and who although he was around the

27   same weight as R. H., competed regularly in the 165 weight class and won at that level. R. H. Depo

28   at 77–79. Whether or not R. H. had only wrestled one individual in the 165 pound classification

21

prior to the league meet, he had clearly wrestled many times against larger, stronger, and more experienced opponents. Simply put, nothing in the record supports R. H.'s claims that he was thrown unprepared into the ring against an opponent unlike any he had ever wrestled before.

### iii.     League Rule Violations

Plaintiffs cite several league rules that they contend Defendants violated over the course of the season. *See* Opp'n at 9–10, 12–13. Plaintiffs argue that these rules are in place to ensure the safety of the wrestlers,  and that Defendants' failure to observe several league rules provides further evidence of their deliberate indifference to R. H. and other wrestlers' safety and well-being. Plaintiffs' arguments are again largely unsupported by the evidence, and what evidence Plaintiffs have produced falls far short of the required showing for deliberate indifference.

First, Plaintiffs argue that R. H. was ineligible to compete in the 165 pound weight class at the league championships because he had not wrestled 50% of his matches in that class during the season. Opp'n at 4. But this assertion is contradicted by the rule itself, which provides a wrestler must have wrestled 50% of his matches in the class in which he is *seeded* for the league championships. *See* 2010 Fisher Wrestling Rules (Rule No. 4 reads: "Varsity wrestlers must wrestle 50% of their matches at the weigh [sic] in which they will be seeded for the end of the season league championship tournament."). According to his coaches, R. H. was not seeded for the league championships, a contention that Plaintiffs appear not to dispute. Summers Decl. ¶ 21; Racimo Decl. ¶ 19. The Court therefore concludes that this league rule did not apply to R. H.[12]

Second, Plaintiffs contend that wrestlers were not weighed prior to each dual meet, as required by the league rules. Opp'n at 11. Defendants admit that they did not keep a roster with corresponding weights which they updated before each dual meet. Summers Depo at 66–67; Racimo Depo at 43–44. This did apparently violate the rule. However, Defendants contend that the

---

[12] Relatedly, Plaintiffs claim Defendants affirmatively misrepresented R. H.'s record at the seeding meeting. Defendants apparently reported R. H.'s record for matches in the 165 pound class as three wins, by forfeit or by points, and one loss. *See* Racimo Depo at 98–99. In fact, his record may have been two wins, two losses. *Id*. at 99–100. It is not clear to the Court whether a wrestler's record is relevant if he is unseeded in a tournament. Even if R. H. was in fact seeded at the tournament, Plaintiffs do not provide any persuasive reason why Defendants' representation of R. H.'s record as three wins and one loss, instead of two wins and two losses, was not simply the result of mere negligence.

22

Case No.: 11-CV-03729-LHK
ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**United States District Court**
For the Northern District of California

1    wrestlers weighed themselves every day, and self-reported their weights to the coaches. Summers

2    Depo at 66–67. Major weight changes that would affect the classes in which a wrestler was

3    qualified to wrestle were noted on the coaches' list of wrestlers. *Id.* Plaintiffs do not challenge this

4    assertion, and they present no evidence to the contrary. While the Defendants may not have strictly

5    adhered to the procedures set forth in the rules regarding a formal weigh-in and recordation prior to

6    all dual meets, the evidence shows that the coaches nevertheless kept close tabs on the wrestlers'

7    weights, and were diligent in noting those changes that affected the wrestlers' eligibility to

8    compete in different weight classes.

9           Finally, as mentioned above, Plaintiffs contend R. H. was not eligible to wrestle in the 165

10   pound class because to do so would be wrestling up two classes, which is not allowed by the league

11   rules. However, as discussed above, even granting Plaintiffs' assertion that R. H.'s weight was

12   below 145 pounds on December 2, 2010, Plaintiffs provide no persuasive argument as to why

13   allowing R. H. to wrestle at that weight level constituted deliberate indifference to R. H.'s safety.

14          For the foregoing reasons, Plaintiffs fail to show that if Defendants violated league rules in

15   any way, such violations exposed R. H. to an "unreasonable risk" or that Defendants "actually

16   intended to expose [R. H.] to such risks without regard to the consequences." *Grubbs*, 92 F.3d at

17   899.

18                        ***iv.*      *"Orchestrated" Mismatch***

19          Regardless of what R. H.'s true weight was when he competed at the league

20   championships, Plaintiffs' theory that Defendant coaches "falsified" R. H.'s weight to

21   "orchestrate" a mismatch between R. H. and his larger opponent does not withstand scrutiny.

22   Plaintiffs make various claims regarding the coaches' motivations and claim Defendants "had no

23   concern for R. H.'s safety going into [sic] the league meet," Opp'n at 5, but for the following

24   reasons these arguments fail to raise a material issue of fact regarding deliberate indifference.

25          First, Plaintiffs claim that the coaches put the interest of winning team competitions above

26   the safety of individual wrestlers. Opp'n at 7, 10. Richard H. testified that he spoke to Defendant

27   Summers about why R. H. had been matched against I. C. in the league championships, and that

28   Defendant Summers told him the reason was that although Summers knew R. H. would lose,

Case No.: 11-CV-03729-LHK
ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1   Summers believed R. H. could avoid getting pinned, which would result in an additional team point

2   over having no wrestler in the 165 pound weight class. Richard H. Depo at 118–19 (testifying that

3   Defendant Summers "didn't believe R. H. would win this match. He recognized this was a bigger,

4   stronger kid. But he believed R. H. would be able to escape getting pinned. And the difference

5   between . . . not getting pinned versus forfeiting that weight class was a point differential. And he

6   believed that R. H. rightly could have lasted out that time—that he had a chance to last out that

7   time without being pinned. If he had been pinned, it was exactly the same as if Fisher didn't

8   wrestle anybody and left it blank."). Defendants dispute both that this conversation occurred and

9   the assertion that at the league championships the team would have been awarded an additional

10  point if they fielded a wrestler who avoided being pinned rather than simply not competing in that

11  weight class. According to Defendants, because the league championships were an elimination-

12  style tournament, whether or not R. H. competed had no impact on the other Fisher wrestlers'

13  success. Summers Decl. ¶ 17; Racimo Decl. ¶ 15. At dual meets and other competitions during the

14  regular season, fielding no wrestler and taking a forfeit could have impacted the team score, but

15  Defendants assert that this was not the case with the end of year tournament. *Id.*

16          However, even accepting Plaintiffs version of the facts, the Court finds that this contention

17  does not suggest deliberate indifference on the part of the Defendants. Not only was competing in

18  the league championship entirely voluntary,[13] but Defendant Summers' testimony does not serve

19  the purpose Plaintiffs claim it does. Defendant Summers chose to permit R. H. to wrestle in that

20  class because he believed R. H. could avoid being pinned, and therefore lose no points. This is

21  hardly evidence of deliberate indifference to his safety. Knowing that he would likely lose does not

22  equate to knowing that he would face an unreasonable risk of danger. If R. H. and his opponents

23

24

---

25  [13] The Court notes that in their Opposition, Plaintiffs allege that they were never informed that
     injuries like those suffered by R. H. were risks that R. H. might face while wrestling on the Fisher

26  team. Opp'n at 6. However, Richard H. testified that he had met the parents of a wrestler who had
     fractured his femur the year before R. H. joined the Fisher team. Richard H. Depo at 51. He

27  also testified that over the course of the season as he watched R. H. compete he came to believe
     "wrestling was more dangerous than taekwondo or other martial arts R. H. had been involved in."

28  *Id.*

Case No.: 11-CV-03729-LHK
ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1    were "hopelessly mismatched" as Plaintiffs claim, Defendant Summers would have had no reason

2    to enter him in that class with the hope that he could avoid being pinned.

3         Second, Plaintiffs assert that the "only reason R. H. was wrestling varsity was because he

4    was on the bigger end of the bell curve and the coaches had a hard time filling slots for the bigger

5    wrestlers." Opp'n at 5. This may have been the case during the regular season, but R. H. makes no

6    claims that he ever felt unsafe during the regular season, or that he was injured, or even that he

7    objected to competing at the 165 pound weight classification at all. To the contrary, R. H. testified

8    that his *only* concern about wrestling in the 165 pound weight class was that he would likely lose

9    most of his matches, and that he was unconcerned about injury. R. H. Depo at 186. Whether it is

10   true that many schools had no wrestler in the 165 pound weight class, and that "the coaches used R.

11   H. to simply pick up easy points for forfeited matches during the *season*," Opp'n at 5 (emphasis

12   added), has no bearing on whether Defendants' deliberate indifference to R. H's safety resulted in

13   his injury at the end of season league championships.

14        Finally, Plaintiffs also contend that Defendant Coaches "made no inquiry about the size,

15   skill, or ability of the opponent R. H. was going to face [at the league championships], despite the

16   fact that R. H. had only wrestled one individual in the 165 lb classification prior to the league

17   meet." Plaintiffs' argument about inquiry into the "size, skill, and ability" of R. H.'s opponent

18   overlooks several critical facts. First, wrestlers were being paired for the 165 pound weight class,

19   which includes only wrestlers within certain bands of weights. Second, the wrestling records used

20   at the seeding meeting to determine the pairings provide some indication of the skill and ability of

21   the wrestlers. Third, other than the unsupported assertions in Plaintiffs' Opposition, *see, e.g.,*

22   Opp'n at 9, Plaintiff has introduced no evidence of R. H.'s opponent's weight, skill, or experience

23   other than the fact that his record was not strong enough for him to be seeded either first or second

24   in the tournament in the 165 pound weight class. Racimo Decl. ¶ 20 (stating that the top two first

25   seeds had byes in the first round, so R. H. could not have been wrestling either the first or second

26   seed); Summers Decl. ¶ 21 (same). As discussed above, R. H. had wrestled larger, heavier, and

27   more experienced opponents all season, and had practiced every day with his coaches and

28   teammates. Finally, the fact that R. H. had only wrestled one individual in the 165 pound weight

25

class in competitive matches proves little, if anything, as his matches in the 155 pound weight class may well have been against wrestlers who themselves also were eligible to wrestle up to the 165 class.

In short, Plaintiffs' allegations that Defendants had no concern for R. H.'s safety fail. Plaintiffs raise no genuine issue of fact as to whether Defendants, by entering him in the 165 pound weight class at the league championships, exposed R. H. to an "unreasonable risk" or that Defendants "actually intended to expose [R. H.] to such risks without regard to the consequences." *Grubbs*, 92 F.3d at 899. Plaintiffs' misquotation of Defendants as having testified that they had "no concerns for R. H.'s safety," when Defendants' actual testimony was that they had no concerns that R. H. would be injured at the league championships, is but one example of Plaintiffs' attempt to find malice where none exists. *See* Opp'n at 5; Summers Depo at 151–54. To have no concerns about potential injuries is a far cry from having no concerns about R. H.'s safety whatsoever, and falls far short of showing Defendants' deliberate indifference to R. H.'s safety.

### *v.*        *Cases Cited By Plaintiffs Are Distinguishable*

Plaintiffs cite several cases in support of their deliberate indifference claim. *See* Opp'n at 8, 10. However, Plaintiffs do not compare them to the facts of this case, and a closer look reveals that the cases are all readily distinguishable.

Plaintiffs cite *Wood v. Ostrander* in support of their argument "it must appear that the state has 'affirmatively placed an individual in a position of danger, effectively stripping a person of his or her ability to defend herself, or cutting off potential sources of private aid.'" Opp'n at 10 (quoting *Johnson v. Dallas Indep. Sch. Dist.*, 38 F.3d 198, 201 (5th Cir. 1994)). In *Wood*, an officer pulled over the plaintiff at 2:30 a.m., impounded her car, and abandoned her in an area the officer knew to have the second-highest rate of crime in the nation. 879 F.2d at 586. *Wood* thus involved an unreasonable risk—leaving the plaintiff stranded and alone, in the middle of the night, in a high-crime area—to which the defendant knowingly exposed the plaintiff by impounding her car and leaving her with no means to get home or even to a safe area. The risk identified by Plaintiffs here is that of wrestling against a larger, more experienced opponent. *See* Opp'n at 9. But unlike in *Wood*, where the female plaintiff was left stranded at 2:30 a.m. in a location the officer knew to

26

United States District Court
For the Northern District of California

1    have the second-highest rate of crime in the nation, an eventuality for which the plaintiff was

2    clearly not prepared, R. H. received daily wrestling instruction for two months and competed

3    against larger, more experienced opponents over the course of the season, both in practice and in

4    competition. Also, whereas in *Wood* the officer exposed the plaintiff to a known risk by

5    impounding her car without providing passage to a safer location, R. H. voluntarily joined the

6    wrestling team and was free to stop wrestling if he so chose.[14]

7          Similar to *Wood* is *Munger v. City of Glasgow Police Dep't*, which Plaintiffs also cite.

8    Opp'n at 8. The Ninth Circuit held in *Munger* that the state-created danger exception applied

9    where, in response to a bartender's request for assistance, police officers ordered a belligerent

10   patron, who had consumed a substantial amount of alcohol, to leave a bar, and not to drive a

11   vehicle. 227 F.3d at 1084. The outside temperature was eleven degrees; accounting for windchill, it

12   was well below zero. *Id*. Wearing only a t-shirt and jeans, the bar patron died that night from

13   hypothermia, and his body was found the following day in an alleyway two blocks from the bar. *Id*.

14   Like the plaintiff in *Wood*, the decedent in *Munger* was involuntarily exposed to harm as a result of

15   a state actor's command. In both cases the state actor was aware of the unreasonable risks to which

16   he was exposing the plaintiff, and in both cases the court found that the state actor was deliberately

17   indifferent to those risks in so acting. For the reasons discussed above, such a situation is readily

18   distinguishable from this case, where Plaintiffs fail to identify any "unreasonable risks" or show

19   that Defendants "actually intended to expose [R. H.] to such risks without regard to the

20   consequences." *Grubbs*, 92 F.3d at 899.

21         Plaintiffs also cite *L.W. v. Grubbs*, which the Court also finds distinguishable. In *Grubbs*,

22   the Ninth Circuit held that the state-created danger exception applied where state correctional

23   _____

24   [14] Contrary to Plaintiffs' protestations that "R. H.'s free will is very much a triable issue," peer pressure to not let down the team is a far cry from the state's exercise of police power to impound a

25   woman's car and leave her without a means of escape at 2:30 a.m. in an area known to have the second-highest crime rate in the nation. Even if a jury were to find the story of L. B. and the bowl

26   of cereal he ate to be evidence that wrestlers felt undue pressure to compete, R. H. himself testified that his *only* concern about wrestling in the 165 pound weight class was that he would likely lose

27   most of his matches, and that he was unconcerned about injury. R. H. Depo at 186. It is hard to square R. H.'s unequivocal statement that he had no concerns about his safety going into the match

28   with the idea that R. H. somehow lacked the "free will" to choose whether or not to wrestle.

27

officers knowingly created an opportunity for a convicted sex offender to assault the custodial

institution's nurse. *Id*. at 896. The plaintiff in *Grubbs* alleged facts that showed an official's

deliberate indifference in creating the dangerous situation by assigning the sex offender to work

with the nurse despite knowing: (1) that the sex offender was not qualified to work in the position

he was assigned; (2) that the sex offender "had an extraordinary history of unrepentant violence

against women and girls;" (3) that the sex offender would "likely assault a female if left alone with

her;" (4) that the nurse "would be alone with [the sex offender]"; and (5) that the nurse "would not

be prepared to defend [herself]" because she was not "informed . . . that she would be left alone

with violent offenders." *L.W. v. Grubbs*, 974 F.2d 119, 121 (9th Cir. 1992).[15]

The remainder of the Ninth Circuit's deliberate indifference opinions are equally unhelpful

to Plaintiffs. *See, e.g., Maxwell v. Cnty. of San Diego*, 708 F.3d 1075, 1083 (9th Cir. 2013)

(delaying a bleeding gunshot victim's ambulance increased the risk of death and demonstrated

defendants' deliberate indifference to victim's safety); *Penilla v. City of Huntington Park*, 115 F.3d

707, 708 (9th Cir. 1997) (police officers violated substantive due process under the state-created

danger exception by locking a seriously ill person in his house and cancelling a neighbor's 911

request for emergency services). In *Kennedy v. City of Ridgefield*, the plaintiff offered evidence

that after she reported a neighbor had molested her young daughter, a police officer placed the

plaintiff in danger by notifying the neighbor of the accusation. 439 F.3d at 1057–58. The officer

assured the plaintiff that he would notify her prior to contacting the neighbor's family about her

allegations. *Id*. at 1058. Instead, the police officer informed the neighbor and his mother of the

plaintiff's allegations without first notifying her. *Id*. When the officer informed the plaintiff that he

had informed the neighbor of her accusations, he promised the plaintiff that the police would patrol

her neighborhood that night. They did not, and the following morning, the neighbor shot the

plaintiff and her husband while they slept. *Id*. The court in *Kennedy* held that the state-created

danger exception applied because the state actor had exposed the plaintiff to a danger which she

---

[15] *Grubbs* went up on appeal twice. First, in 1992 after the district court dismissed the action for
failure to state a claim, and later, in 1996 after the district court granted summary judgment as to all
but one defendant, who proceeded to trial and then appealed on the basis that the jury had been
improperly instructed as to deliberate indifference. *See Grubbs*, 92 F.3d at 895.

Case No.: 11-CV-03729-LHK
ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1   otherwise would not have faced. *Id.* at 1062–63. Here, in contrast, even if the Court were to accept

2   that R. H. had been exposed to an unreasonable risk of danger through the machinations of his

3   coaches, the evidence does not show that R. H. would not have been exposed to such a risk absent

4   his coaches' misconduct. R. H. voluntarily chose to participate in the league championships, and he

5   chose to do so with the knowledge that he would be participating in the 165 pound weight class,

6   *see* R. H. Depo at 186, and, accepting his claim regarding his weight as true, with the knowledge

7   that he weighed 148.5 pounds fully clothed. Unlike in *Kennedy*, *Grubbs*, *Wood*, and *Munger*,

8   where the state actor's conduct placed plaintiffs in dangerous situations with no means to defend

9   themselves or seek help, R. H. was provided instruction, training, and guidance over the course of

10  the season.

11      The Court rejects Plaintiffs' argument that R. H.'s coaches' conduct is comparable to

12  assigning a known sex offender with an "extraordinary history of unrepentant violence against

13  women and girls" to work alone with a female nurse as in *Grubbs*; or through the exercise of police

14  power stranding a person in a dangerous situation from which they were woefully ill-equipped to

15  escape as in *Wood* and *Munger*; or informing a disturbed, violent man that a neighbor had reported

16  him for molesting their daughter and then failing to protect the reporting party despite promises to

17  do so, as in *Kennedy*.

18      The Court concludes Defendants have satisfied their burden of demonstrating the absence

19  of a genuine issue of fact for trial as to Defendants' deliberate indifference. *Celotex*, 477 U.S. at

20  323. Accordingly, the burden shifts to Plaintiffs to show a genuine issue of material fact. A

21  plaintiff "cannot defeat summary judgment with allegations in the complaint, or with unsupported

22  conjecture or conclusory statements." *Hernandez v. Spacelabs Med., Inc.*, 343 F.3d 1107, 1112

23  (9th Cir. 2003). Plaintiffs have not met their burden. The vast majority of Plaintiffs' evidence

24  consists of conclusory statements that Defendants acted with a "conscious, indifferent, and callous

25  disregard for the safety and wellbeing of R. H.," Opp'n at 11, and Plaintiffs have introduced

26  practically no "significant probative evidence tending to support the complaint." *Rivera v.

27  AMTRAK*, 331 F.3d 1074, 1078 (9th Cir. 2003). This case survived a motion to dismiss on the basis

28  of allegations in the SAC regarding Defendants' conduct that have not been borne out through

29

United States District Court
For the Northern District of California

1    discovery. Those claims in the SAC that might have supported a finding of deliberate indifference

2    have now either been disavowed by Plaintiffs, or Plaintiffs have failed to uncover and introduce

3    evidence sufficient to support them.

4        Accepted as true and viewed together, Plaintiffs' allegations may add up to a colorable case

5    that Defendants were negligent, but "the Fourteenth Amendment . . . does not transform every tort

6    committed by a state actor into a constitutional violation." *DeShaney*, 489 U.S. at 202. To prevail

7    on a deliberate indifference theory and sustain a Section 1983 action where the plaintiff alleges the

8    state failed to protect an individual from harm by third parties, a plaintiff must show the state actor

9    "recognized [an] unreasonable risk and actually intended to expose the plaintiff to such risks

10   without regard to the consequences to the plaintiff." *Grubbs*, 92 F.3d at 899. Here, Plaintiffs have

11   failed to make this showing, and a rational factfinder could not find the requisite mental state.

12   Accordingly, because Plaintiffs have failed to introduce evidence of deliberate indifference on the

13   part of the Defendants, the Court finds that Plaintiffs Section 1983 claims fail as a matter of law.[16]

14       **B.    State Law Claims (Counts II, III, and V–IX)**

15       Plaintiffs' state law claims comprise four claims based on negligence, and three ostensibly

16   intentional torts. Plaintiffs' negligence claims are for: (1) negligence (Count II); (2) failure to

17   train/hire/supervise (Count III); (3) negligent misrepresentation (Count VII), and (4) negligent

18   infliction of emotional distress (Count VIII). Plaintiffs' claims styled as "intentional torts" are (1)

19   intentional misrepresentation (Count V); (2) concealment (Count VI); and (3) intentional infliction

20   of emotional distress (Count IX).

21       In their motion for summary judgment, Defendants argue that Plaintiffs expressly agreed to

22   release and hold harmless Defendants from any and all liability that R. H. might suffer as a result

23   of his participation on Fisher's wrestling team.[17] *See* Mot. at 15-16. In response, Plaintiffs

24   challenge the release on several grounds, including that a release cannot waive liability for grossly

---

[16] Because the Court dismisses Plaintiffs' Section 1983 claims on this ground, the Court need not reach Defendants' argument that Defendants are entitled to qualified immunity. *See* Mot. at 16-17.
[17] Defendants also argue that Plaintiffs' negligence claims are barred by the doctrine of implied assumption of risk. *See* Mot. at 13-15. Because the Court finds that Plaintiffs explicitly waived Plaintiffs' right to pursue negligence actions against Defendants, the Court need not reach the question of implied assumption of risk.

Case No.: 11-CV-03729-LHK
ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

negligent conduct, that the release was against public policy, that the release was unconscionable,

because there was no meeting of the minds when the contract was formed, that there was no

consideration for the release, and because they contend Defendants breached the contract in bad

faith. *See* Opp'n at 21–23. For the reasons explained below, Plaintiffs' arguments fail.

Accordingly, the Court finds that the release expressly precludes Plaintiffs' negligence claims.

Plaintiffs' claims for "intentional misrepresentation" and "concealment" are explicitly

premised on violations of California statutes that Plaintiffs contend impose mandatory duties on

Defendants with regard to the safety of students under their care. *See* SAC ¶¶ 80–81, 92–94 (citing

California Education Code § 44807 & § 44808 as well as California Government Code § 815.6).

As such, the Court sees no distinction between these claims and claims that sound in negligence.

This is because these causes of action essentially allege Defendants violated statutorily imposed

*duties* of care, which "sound generally in negligence, [because they] entail[] proof of the 'well-

known elements of any negligence cause of action, viz., duty, breach of duty, proximate cause and

damages.'" *Lockheed Martin v. Superior Court*, 29 Cal. 4th 1096, 1106 (2003) (citation omitted).

Accordingly, to the extent Plaintiffs' intentional misrepresentation and concealment claims are not

duplicative of Plaintiffs' other negligence claims, which is not entirely clear from the face of the

SAC, Plaintiffs' claims for intentional misrepresentation and concealment rise or fall with

Plaintiffs' other negligence claims. That is, any waiver of liability for Defendants' negligent

conduct will apply equally to Plaintiffs' "intentional misrepresentation" and "concealment" claims.

Thus, the Court finds that the liability release expressly precludes these claims as it does Plaintiffs'

other negligence claims.

Lastly, Plaintiffs' intentional infliction of emotional distress claim fails because the Court

finds that, as a matter of law, Plaintiffs have not introduced evidence of conduct that may

reasonably be regarded as so extreme and outrageous as to permit recovery.

The Court first discusses Plaintiffs' negligence claims before turning to intentional

infliction of emotional distress.

        **1.**     ***Express Assumption of Risk and Advance Waiver of Liability—Negligence Claims (Counts II, III, and V–VIII)***

Case No.: 11-CV-03729-LHK
ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California

1    An action in negligence requires a showing that the defendant owed the plaintiff a legal

2    duty, the defendant breached the duty, and the breach was a proximate cause of the injuries

3    suffered by the plaintiff. *See Allabach v. Santa Clara County Fair Assn.*, 46 Cal. App. 4th 1007,

4    1011 (1996). Generally, persons are under a duty to exercise due care to avoid injury to others, and

5    a defendant who breaches that duty may be held liable for injuries that arise from his careless

6    conduct. *See* Cal. Civ. Code § 1714; *Knight v. Jewett*, 3 Cal. 4th 296, 315 (Cal. 1992). In the

7    context of sports, and especially contact sports, "conditions or conduct that otherwise might be

8    viewed as dangerous often are an integral part of the sport itself." *Id*. Consequently, "[a]lthough

9    defendants generally have no legal duty to eliminate (or protect a plaintiff against) risks inherent in

10   [a] sport itself, . . . defendants generally do have a duty to use due care not to increase the risks to a

11   participant over and above those inherent in the sport." *Id*. at 315–16. Plaintiffs contend that

12   Defendants increased the risks to R. H.'s safety above those normally associated with wrestling by

13   falsifying his weight and matching him up against a larger, more experienced wrestler, thereby

14   breaching their duty to R. H. Opp'n at 16–17. However, because the Court finds that Plaintiffs

15   expressly released Defendants from liability for injuries suffered in connection with wrestling on

16   the Fisher team, and expressly assumed the risk of such injuries, Plaintiffs' state law negligence

17   claims fail.

18       A valid written release may exculpate a tortfeasor from future negligence or misconduct.

19   *See Bennett v. United States Cycling Federation*, 193 Cal. App. 3d 1485, 1490 (1987). Such a

20   release may be either an advance waiver of liability, express assumption of risk, or both. *See*

21   *Coates v. Newhall Land & Farming, Inc.*, 191 Cal. App. 3d 1, 7 (1987). "By an advance waiver of

22   liability, a potential plaintiff promises not to exercise the right to sue for harm caused in the future

23   by the wrongful behavior of a potential defendant, eliminating a remedy for wrongdoing. By an

24   express assumption of risk, the potential plaintiff agrees not to expect the potential defendant to act

25   carefully, thus eliminating the potential defendant's duty of care, and acknowledging the possibility

26   of negligent wrongdoing. Both agreements permit behavior that normally would be actionable as

27   tortious, although an express assumption of risk goes further, more clearly authorizing this

28   behavior." *Id*. at 7–8; *see also Benedek v. PLC Santa Monica, LLC*, 104 Cal. App. 4th 1351, 1356

32

**United States District Court**
For the Northern District of California

(2002) ("A release may negate the duty element of a negligence action."); *Von Beltz v. Stuntman, Inc.*, 207 Cal. App. 3d 1467, 1477 n.3 (1989) (express assumption of risk acts as a complete bar to recovery in a negligence action).

Prior to R. H. joining the wrestling team and the commencement of the wrestling season, Plaintiff Richard H. signed a release form which contained both an advance waiver of liability and an express assumption of risk.[18] ECF No. 64, Ex. A (waiver providing that Plaintiffs release Defendants "from any and all liability for any injury which may be suffered by [R. H.], arising out of or in any way connected with participation in [the wrestling team]," and assume all risks for any injuries received). The Court finds the release signed by Plaintiffs valid and enforceable, and consequently that the release bars Plaintiffs negligence claims, as explained below.

A liability release "must be clear, unambiguous, and explicit in expressing the intent of the subscribing parties." *Id*. "[A] release must not be buried in a lengthy document, hidden among other verbiage, or so encumbered with other provisions as to be difficult to find." *Leon v. Family Fitness Center (# 107), Inc.*, 61 Cal. App. 4th 1227, 1232 (1998). "[R]ead as a whole, [a written release] must clearly notify the prospective releasor or indemnitor of the effect of signing the agreement." *Ferrell v. Southern Nevada Off-Road Enthusiasts, Ltd.*, 147 Cal. App. 3d 309, 318 (1983). However, a release need not achieve perfection, *Paralift, Inc. v. Superior Court*, 23 Cal. App. 4th 748, 755 (1993), and "[t]he inclusion of the term 'negligence' is simply not required to validate an exculpatory clause." *Sanchez v. Bally's Total Fitness Corp.*, 68 Cal. App. 4th 62, 67 (1998).

The determination of whether a release contains ambiguities is a matter of contractual construction, and is a question of law, not of fact. *Benedek*, 104 Cal. App. 4th at 1357; *Madison v. Superior Court*, 203 Cal. App. 3d 589, 598 (1988). "An ambiguity exists when a party can identify an alternative, semantically reasonable, candidate of meaning of a writing," and ambiguities may "be patent, arising from the face of the writing, or latent, based on extrinsic evidence." *Solis v.*

---

[18] Because it is "well established that a parent may execute a release on behalf of his or her child[,]" the release signed by Richard H. bars Plaintiffs' negligence claims regardless of whether they are brought by R. H. or Richard H. *Aaris*, 64 Cal. App. 4th at 1120; *see also Hohe v. San Diego Unified Sch. Dist.*, 224 Cal. App. 3d 1559, 1565 (1990).

Case No.: 11-CV-03729-LHK
ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**United States District Court**
For the Northern District of California

1    *Kirkwood Resort Co.*, 94 Cal. App. 4th, 354, 360 (2001). A release containing ambiguity as to its

2    scope will normally be construed against the drafter. *See* Cal. Civ. Code § 1654; *Solis*, 94 Cal.

3    App. 4th at 360.

4          The express language of the release determines its scope. *Sanchez*, 68 Cal. App. 4th 62, 69

5    (1998). "The express terms of the release must be applicable to the particular negligence of the

6    defendant, but every possible specific act of negligence of the defendant need not be spelled out in

7    the agreement." *Benedek*, 104 Cal. App. 4th at 1357. When a release expressly releases the

8    defendant from *any* liability, a plaintiff need not have had specific knowledge of the particular risk

9    that ultimately caused the injury. *Id.*; *Paralift*, 23 Cal. App. 4th at 757. If all liability is released,

10    the release applies to any negligence on the part of the defendant, and "it is only necessary that the

11    act of negligence, which results in injury to the releasor, be reasonably related to the object or

12    purpose for which the release is given." *Id*. The result of an express release of liability is that "the

13    defendant owes no duty to protect the plaintiff from injury-causing risk." *Knight*, 3 Cal. 4th at 308

14    n.4. Accordingly, where a defendant raises the defense of express assumption of risk, "[t]he issue is

15    not whether the particular risk of injury is inherent in the recreational activity to which the release

16    applies, but rather the scope of the release." *Benedek*, 104 Cal. App. 4th at 1357. "An act of

17    negligence is reasonably related to the object or purpose for which the release was given if it is

18    included within the express scope of the release." *Id*.

19          Here, the release signed by Plaintiffs was clear, unambiguous, and explicit. It expressly

20    released Defendants from "any injury" "arising out of or in any way connected with participation"

21    in the wrestling program. ECF No. 64, Ex. A. It was not buried at the end of a long document, or

22    buried deep within an imposing wall of text. It was clearly set out at the end of a short form that

23    Plaintiffs filled out with R. H.'s medical and contact information. The purpose for which the

24    release was given was to permit R. H. to wrestle on the Fisher wrestling team. The conduct

25    challenged by Plaintiffs—weight falsification, failure to train, failure to follow league rules, etc.—

26    all occurred in connection with the purpose for which Plaintiffs released Defendants: participation

27    on the Fisher wrestling team. Accordingly, the Court finds that the scope of the release is

28    sufficiently broad to encompass the conduct alleged by Plaintiffs to constitute negligence.

34

1    Other courts have reached the same conclusion in similar circumstances. For example, a

2 release in connection with parachuting activities which released defendant "forever," and without

3 exception,[19] applied to bar plaintiff's negligence action arising out of injuries sustained while

4 parachuting three years after the release was executed and in a different location than where the

5 activities covered by the release originally began. *Paralift*, 23 Cal. App. 4th at 756–57.[20] Releases

6 given in connection with fitness activities and gyms have been found applicable to injuries

7 sustained while engaged in fitness activities. *See Sanchez*, 68 Cal. App. 4th at 68 (during exercise

8 class plaintiff slipped and fell on exercise mat between exercises); *Lund v. Bally's Aerobic Plus,*

9 *Inc.*, 78 Cal. App. 4th 733, 738 (2000) (plaintiff injured spine while using weight lifting equipment

10 under the guidance and supervision of personal trainer). Where the scope of a release was "all

11 personal injuries" suffered while on the premises of a health club, "whether using exercise

12 equipment or not," the release was held to cover injuries sustained as a result of adjusting a

13 television near exercise equipment at the health club. *Benedek*, 104 Cal. App. 4th at 1358.

14    The Court finds Plaintiffs expressly waived their right to bring negligence claims against

15 Defendants for injuries stemming from R. H.'s participation on the Fisher wrestling team. Plaintiffs

16 resist this conclusion, arguing that that the release: (1) is invalid because it purports to release

17 Defendants for gross negligence; (2) is invalid as against public policy; and (3) is unenforceable on

18 various other asserted but unargued grounds. Because for the reasons explained below Plaintiffs

19 fail to establish the release is either invalid or unenforceable, no genuine issue of material fact

20 exists as to Plaintiffs' state law negligence claims, and summary judgment is granted as to these

21 claims.

22                                *i.    Gross Negligence*

23    The parties agree that a release cannot waive grossly negligent conduct. Opp'n at 21

24 ("[U]nder California law, liability waivers exempting anyone from liability for gross negligence,

---

[19] The release stated, in part, "I hereby forever Release and Discharge ... Paralift, Inc., ... from any
and all liabilities, claims, demands or causes of action that I may hereafter have for injuries and
damages arising out of participation in parachuting activities, including, but not limited to, losses
Caused by the Passive or Active Negligence of the Released Parties or hidden, latent, or obvious
defects on the dropzone [or] in the equipment or aircraft used." *Paralift*, 23 Cal. App. 4th at 752.
[20] The Defendant company provided an aircraft as well as pilot services for those who signed up to
go skydiving with the Defendant company. *Paralift*, 23 Cal. App. 4th at 748.

Case No.: 11-CV-03729-LHK
ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California

1  willful injury, fraud, or violation of the law are invalid."); Reply at 10. In *City of Santa Barbara v.*

2  *Superior Court of Santa Barbara County*, 41 Cal. 4th 747, 751 (2007), the California Supreme

3  Court considered the issue of whether a release may waive the liability of an operator of

4  recreational facilities for the facilities' grossly negligent conduct. *Id.* at 750. The court held that as

5  a matter of public policy, release agreements waiving liability for future gross negligence are

6  unenforceable. *Id.* at 777. Here, as a preliminary matter, the release does not purport to release

7  grossly negligent conduct, so it is not void on its face, as Plaintiffs appear to argue. Opp'n at 20–

8  23. Second, the Court finds that the facts in this case simply do not support a finding that

9  Defendants' conduct was grossly negligent.[21]

10        Whereas ordinary negligence "consists of a failure to exercise the degree of care in a given

11  situation that a reasonable person under similar circumstances would employ to protect others from

12  harm," gross negligence requires "a want of even scant care or an extreme departure from the

13  ordinary standard of conduct." *City of Santa Barbara*, 41 Cal. 4th at 753–54. Although it is

14  generally a "triable issue of fact whether there has been such a lack of care as to constitute gross

15  negligence," *id.* at 767, a court may grant summary judgment where no evidence supports a finding

16  of gross negligence. *Decker v. City of Imperial Beach*, 209 Cal. App. 3d 349, 358 (1989); *De Vito*

17  *v. State of California*, 202 Cal. App. 3d 264, 272 (1988).

18        Defendants argue that "the undisputed facts in this case simply do not give rise to a claim

19  for gross negligence." Reply at 10. The Court agrees. Plaintiffs contend that "Defendants here

20  engaged in gross negligence when they allowed R. H. to weigh in with his clothes on and then

21  falsified his weight to make him eligible to wrestle two weight classes higher than his actual

22  weight." Opp'n at 21–22. "This mismatch was the creation of the Defendants, not an inherent risk

23

24  [21] Defendants are incorrect that Plaintiffs' failure to specifically plead gross negligence in the SAC
    bars Plaintiffs' present claim that Defendants were grossly negligent. Reply at 10. "Gross

25  negligence is not so much a cause of action as it is a 'limitation on the defense that is provided by a
    release.'" *Wallace v. Busch Entm't Corp.*, 837 F. Supp. 2d 1093, 1101 (S.D. Cal. 2011) (quoting

26  *City of Santa Barbara*, 41 Cal. 4th at 780 n.58); *see also Eriksson*, 191 Cal. App. 4th at 857 n.18
    (no distinct cause of action for gross negligence under California law absent statutory basis).

27  "Plaintiff is not required to anticipate the defense of release; instead, the defendant bears the
    burden of raising the defense and establishing the validity of a release as applied to the case at

28  hand." *Wallace*, 837 F. Supp. 2d at 1101 (internal quotation marks and citation omitted).

36

Case No.: 11-CV-03729-LHK
ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California

1    of wrestling. In fact the rules of wrestling are designed to avoid this exact situation. Orchestrating

2    such a mismatch amounts to gross negligence and recklessness." *Id*. at 22. Plaintiffs' gross

3    negligence argument is thus based on allegations that Defendants: (1) falsified R. H.'s weight; and

4    (2) violated league rules in orchestrating a mismatch between R. H. and a larger opponent at the

5    league championships.

6         Plaintiffs' allegations of gross negligence fail for the same reasons their deliberate

7    indifference theory fails. First, even granting Plaintiffs' assertion that R. H.'s weight was 144.5

8    pounds on December 2, 2010—and thus assuming Defendants falsified R. H.'s weight as 152.6—

9    Plaintiffs provide no reason to find that allowing R. H. to wrestle at that weight in the 165 pound

10   weight classification constituted gross negligence when in fact a student weighing 145 pounds

11   would have been eligible to wrestle in the 165 pound class. Indeed, while Plaintiffs place great

12   emphasis on the league rules and argue that the weight classifications are in place to ensure the

13   safety of the wrestlers, Plaintiffs present no evidence to support the contention that permitting a

14   144.5 pound wrestler to wrestle in the 165 pound weight class is "an extreme departure from the

15   ordinary standard of conduct," when allowing a 145 pound wrestler to do the same would be

16   permissible under the league rules. Second, the only allegations of league rule violations for which

17   Plaintiffs have evidentiary support are that Defendants failed to conduct official weigh-ins before

18   dual meets, and failed to keep a signed roster reflecting these measurements. In light of

19   Defendants' uncontradicted assertion that wrestlers weighed in every week day at every practice

20   and self-reported these weights to the coaches, the Court concludes that the evidence does not show

21   "a want of even scant care or an extreme departure from the ordinary standard of conduct." *City of*

22   *Santa Barbara*, 41 Cal. 4th at 753–54.

23              *ii.*     ***Release is Not Invalid As Against Public Policy***

24        Plaintiffs argue that the release is void as against public policy because: (1) the release is

25   silent as to the type of injury which might result from participation in the wrestling program; (2)

26   there was no meeting of the minds upon the formation of the contract because Plaintiffs were not

27   informed that the injuries R. H. suffered were risks associated with wrestling; and (3) the release is

28   an unconscionable adhesion contract. Opp'n at 22–23. The Court notes that California "courts

37

United States District Court
For the Northern District of California

1    consistently hold that recreation does not implicate the public interest, and therefore approve

2    exculpatory provisions required for participation in recreational activities." *Lhotka v. Geographic*

3    *Expeditions, Inc.*, 181 Cal. App. 4th 816, 823 (2010) (collecting cases). The Court finds the release

4    at issue here is likewise valid, and that Plaintiffs' arguments to the contrary fail for the following

5    reasons.

6         First, Plaintiffs provide no reason to find that because they were not informed of the

7    specific risks of wrestling and what injuries were possible, the release is therefore invalid. Nor do

8    Plaintiffs cite any authority to support such an assertion. Plaintiffs cite to *Roesch v. De Mota*, 24

9    Cal. App. 2d 563, 572 (1944), for the proposition that "waiver is the intentional relinquishment of a

10   known right after knowledge of the facts." Opp'n at 22. However, specific knowledge of risks to be

11   encountered is only required under the doctrine of *implied* assumption of risk, and not under that of

12   express assumption of risk. *Madison*, 203 Cal. App. 3d at 601 n.8. "[K]nowledge of a particular

13   risk is unnecessary when there is an express agreement to assume all risk; by express agreement a

14   'plaintiff may undertake to assume all of the risks of a particular . . . situation, whether they are

15   known or unknown to him.'" *Coates v. Newhall Land & Farming, Inc.*, 191 Cal. App. 3d 1, 9

16   (1987) (citing Rest. 2d Torts § 496D, com. a; Prosser & Keeton, Torts (5th ed. 1984) § 68, at 482).

17   "Whether [R. H.] knew about that specific possibility at the time he signed the release is

18   irrelevant." *Id*. Accordingly, Plaintiffs can claim no triable issue of fact regarding whether they

19   were specifically informed of the particular risk(s) that resulted in R. H.'s injuries.

20        Second, Plaintiffs contend that there was no meeting of the minds upon formation of the

21   contract because Defendants failed to inform them that the injuries R. H. suffered were risks

22   associated with wrestling. Opp'n at 23. This argument fails for the same reason as the first. By

23   expressly assuming the risks associated with wrestling, Plaintiffs assumed all of the risks of the

24   situation, known and unknown. *Coates*, 191 Cal. App. 3d at 9. Furthermore, R. H. testified that his

25   general understanding was that the release form "releas[ed] the school district and the coaches form

26   any and all injuries that [he] might sustain while participating on the Fisher wrestling team." R. H.

27   Depo at 50–51. Thus, the evidence shows Plaintiffs' knowledge of the effect of the release suggests

28

38

1    that Plaintiffs fully understood that they were releasing Defendants from liability for all injuries,

2    which logically would include injuries from both known and unknown risks.

3         Third, Plaintiffs also challenge the release as an unconscionable adhesion contract. Opp'n at

4    22–23. Plaintiffs insist that the contract was imposed by the party with superior bargaining power

5    and that there was "an absence of meaningful choice on the part of one of the parties together with

6    contract terms which are unreasonably favorable to the other party." Opp'n at 23 (citing Cal. Civ.

7    Code § 1670.5(b)). The Court rejects Plaintiffs' argument. Adhesion contracts are but one of

8    several categories of contracts the California Supreme Court has held affect the public interest and

9    therefore should be scrutinized to ensure they do not operate against public policy. *Tunkl v.*

10   *Regents of Univ. of Cal.*, 60 Cal. 2d 92, 100 (1963). The Court in *Tunkl* found that a contract

11   imposed upon a patient in the admission room of a hospital amounted to an adhesion contract

12   because the patient was in no position to bargain with the hospital or to find another hospital who

13   might offer better terms, and that under such circumstances the hospital's contract affected the

14   public interest. *Id.* at 102. The release signed by Plaintiffs in this case as a prerequisite to

15   participating on the Fisher wrestling team is materially distinguishable. R. H. sought to join the

16   Fisher team in part because he wanted to make friends at his new school, but Plaintiffs were free to

17   find another wrestling team if they did not wish to release the team from liability for any injuries R.

18   H. might suffer. Richard H. Depo at 40. Nor is wrestling a critical public service like the provision

19   of hospital services. Plaintiffs were in a situation far removed from that of the hospital patient in

20   urgent need of medical care waiting in a hospital admission room. Around the time Plaintiffs

21   received the release, they carefully considered the implications of R. H.'s participation on the

22   wrestling team, including the risk of injury. *Id.* at 46–49; R. H. Depo at 50–51. Finally, it is notable

23   that courts have held that as a general principle, "[e]xculpatory agreements in the recreational

24   sports context do not implicate the public interest and therefore are not void as against public

25   policy." *Benedek*, 104 Cal. App. 4th at 1356-57.

26              iii.    ***Plaintiffs' Cursory Allegations of Breach of Contract and Lack of***
                        ***Consideration Fail***
27

28

Case No.: 11-CV-03729-LHK
ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1        Plaintiffs also argue that Defendants "in bad faith breached the 'waiver' contract" and that

2  Defendants' "deliberate indifference, gross negligence, and reckless conduct represent a failure of

3  consideration." Opp'n at 23. Both arguments fail. Plaintiffs provide no explanations for how

4  negligent or reckless conduct which they allege occurred after they signed the release affects

5  consideration, and the Court can see no connection. Nor do they identify how Defendants breached

6  the contract. If Plaintiffs mean to say that Defendants' negligence amounted to a breach of the

7  release contract, such an argument is meritless. Negligence, and any injury which might result, is

8  precisely that for which the contract releases Defendants.

9        In sum, "[b]ehavior which is authorized is not wrongful and, logically, cannot be the basis

10  of a [negligence] action." *Coates*, 191 Cal. App. at 8. "In its most basic sense, assumption of risk

11  means that the plaintiff, in advance, has given his *express* consent to relieve the defendant of an

12  obligation of conduct toward him, and to take his chances of injury from a known risk arising from

13  what the defendant is to do or leave undone. . . . The result is that the defendant is relieved of legal

14  duty to the plaintiff; and being under no duty, he cannot be charged with negligence." Prosser &

15  Keeton, Torts (5th ed. 1984) § 68, at 480-481. By contractually agreeing to assume all the risks of

16  participation on the Fisher wrestling team and by expressly releasing Defendants from liability for

17  any injuries sustained in connection with participation on the team, Plaintiffs consented to certain

18  acts or omissions by Defendants which might otherwise have constituted negligence. *See* 4 Witkin,

19  Summary of Cal. Law (8th ed. 1974) Torts, § 161, at 2451. Because Plaintiffs' possible negligence

20  recovery for Counts II, III, and V–VIII is mooted by Plaintiffs' prior contractual consent, any

21  issues of fact regarding Defendants' negligence are not material, and the Court must grant

22  summary judgment as to these claims.

23       **2.**    ***Intentional Infliction of Emotional Distress (Count IX)***

24        The Court now addresses Plaintiffs' intentional infliction of emotional distress claim.

25  "Under California law, the elements of intentional infliction of emotional distress are: (1) extreme

26  and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the

27  probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional

28  distress; and (3) actual and proximate causation of the emotional distress by defendant's

40

**United States District Court**
For the Northern District of California

outrageous conduct." *Sabow v. United States*, 93 F.3d 1445, 1454 (9th Cir. 1996) (citing *Christensen v. Superior Court*, 54 Cal. 3d 868, 903 (1991)). "Extreme and outrageous conduct is conduct that is so extreme as to exceed all bounds of that usually tolerated in a civilized community." *Myung Chang v. Lederman*, 172 Cal. App. 4th 67, 86 (2009). Furthermore, the conduct must be "of a nature which is especially calculated to cause, and does cause, mental distress." *Id.* at 86–87.

In their motion for summary judgment, Defendants do not specify why Plaintiffs' claim for intentional infliction of emotional distress fails other than to say generally that there is no basis for Plaintiffs' contention that Defendants violated R. H.'s legal rights. Mot. at 3. Nevertheless, "it is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery." *Id.* at 87. In determining whether a defendant's conduct rises to the level of outrageous in this context, it is "not enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Rest. 2d Torts, § 46, com. d.

As discussed in detail above, the allegations in the SAC that might have risen to this level have not been substantiated through discovery, and even construing all facts in favor of Plaintiffs, the evidence fails to bear out their allegations of outrageous conduct sufficient to support a claim for intentional infliction of emotional distress. Such evidence as has been uncovered by Plaintiffs is inadequate to arouse the resentment of an "average member of the community" against the Defendants, nor to lead one to exclaim, "Outrageous!" *KOVR-TV, Inc. v. Superior Court*, 31 Cal. App. 4th 1023, 1028 (1995); *Cochran v. Cochran*, 65 Cal. App. 4th 488, 496 (1998) ("[M]ajor outrage is still essential to the tort."). The Court therefore finds summary judgment is appropriate as to this claim.

**IV.    CONCLUSION**

41

1
2
3
4
5
6
7
8
9
10

United States District Court
For the Northern District of California

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

For the foregoing reasons, the Court GRANTS Defendants' Motion for Summary Judgment in full. Plaintiffs have failed to show the existence of a genuine issue of material fact as to whether there was deliberate indifference on the part of Defendants, and therefore have no cognizable federal claim under Section 1983. Plaintiffs' negligence-based state law claims are precluded because Plaintiffs expressly released Defendants from liability and assumed the risks of competitive wrestling. Finally, because Plaintiffs have introduced no evidence of outrageous conduct, the Court finds no genuine issue of material fact as to Plaintiffs' claim of intentional infliction of emotional distress. The clerk shall close the case file.

**IT IS SO ORDERED.**

Dated: April 2, 2014

_Lucy H. Koh_

LUCY H. KOH
United States District Judge

42

Case No.: 11-CV-03729-LHK
ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT